Next argued case, December 19, 1718, Intellectual Ventures II LLC v. Aisin Seiki Co., Ltd. Mr. Stewart. Thank you very much. We have four different grounds to go through, four grounds found by the board. And I'd like to start with the Keneshi grounds. We have to reverse all of them for you to survive, right? You do. Okay. On the Keneshi grounds, the petitioners conceded below that Keneshi disposes a stator can made of polydicyclopentadiene, which I'll call poly-D. And it's undisputed that poly-D is not a thermoplastic. And it's also undisputed that the stator can of Keneshi must be made of a thermoplastic in order to meet the claims. So the issue before the board was whether it would have been obvious to substitute a thermoplastic in place of poly-D in the stator can of Keneshi. And I asked the court to look closely at the actual evidence presented by the parties on this issue. The petitioners had the burden of proof and submitted just two conclusory sentences from their expert, Dr. Trumper. The first, which appears in paragraph 86 of his declaration at appendix 3110, asserted that the substitution would have been obvious because Keneshi teaches using thermoplastics to seal the stator core. That's the stator core. Let me ask you, at the threshold, was there any attempt to narrow these claims to restrict them to the interpretation that's now being presented by amendment? No, not during the IPR proceedings, Your Honor. Okay. So, I mean, there's no doubt that Keneshi says you could use the same material for both parts, right? Keneshi does not say that with respect to the stator can. It says with respect to sealing the stator core, you could use either a thermoplastic or the poly-D material or some other materials as well. But I thought there was some passage that says at least some of the time, both pieces, the can and the mold can be made of the same material. That is correct, Your Honor. What it doesn't say is that regardless of what the material is, you can use the same material for the can and the mold. That's correct, Your Honor. Right, and that's what the board, that I take it is your central factual objection to what the board concluded, that that's just an unsubstantiated inference that because Keneshi says you can sometimes use the same material, it implies that you can use the same material always, including one that would be inappropriate for the can. That's absolutely correct, Your Honor. So what about Keneshi gets you to that last point, which is the hurdle you have to overcome? When you've got Keneshi saying you can at least sometimes use the same material, what in Keneshi itself tells you that you can't use it all the time? You can't use the same material all the time? Keneshi itself does not address that. It's a patent. It's not a theoretical article. But what we have is the evidence presented by both sides, and as I was starting to allude to, the evidence presented by the petitioners was two conclusory sentences by their expert, Dr. Tremper. We presented on the other side a detailed explanation from our expert as to why one would not, one with a skill in the art would not substitute a thermoplastic in the state or can region because of the heating concerns and the melting and softening of the thermoplastic that would occur. So is your argument that the board always has to have expert testimony in order to interpret a prior art reference? No, Your Honor. The board doesn't always need expert testimony, but the board needs evidence, and there's nothing in Keneshi itself that says or even suggests that the thermoplastic material may be used at the state or can. It does suggest that, as Judge Toronto was saying, that you can use a thermoplastic material in parts and that you can use the same material for everything in some circumstances, but it does not say that you can use thermoplastic for all parts in all circumstances. And so what more should the expert, the petitioner's expert, have had to say? Well, the petitioner's expert said nothing on reply, and I think in reply the petitioner's expert could have contradicted the factual allegations made by our expert, Dr. Garris, if in fact he had any disputes with those points that he had made. Can I ask you, I'm not sure, and you can tell me if I'm wrong about this, I'm not sure the board relied on this and I'm not sure that the petitioners relied on this, but what do you make of paragraphs 30 and 38 of Keneshi? This might be taken to mean that a synthetic resin can be used for the whole thing, and that would be 38 and 30 referring to synthetic resins such as heat-curing resins and thermoplastic resins. As I say, I don't remember either the petitioners or the board relying on that, but I wonder whether it should give us some pause. Your expert, I think, referred to, in 38, says metal synthetic resin or fiber-reinforced, and I think your expert referred only to the metal and the fiber-reinforced resin in a little table in his declaration and said nothing about synthetic resin. There is a reference to synthetic resin here, but again, it's to seal the stator core in paragraph 30 and not to create the stator can, and I don't think that there is a fair inference in Keneshi itself that you would make the stator can out of the thermoplastic material. Well, why isn't sealing the stator core the same thing as making the molded portion 5 and the stator can 51? How else do you seal the core? You seal the core with, you can seal it with a thermoplastic resin on the exterior, sealing the outer core, but the can itself is a different component, and we think at the very least that a person skilled in the art of reading these passages would understand, as we explained by analogy about making a wooden fireplace in a house, that you wouldn't do that, that that's not a reasonable reading of this because a person skilled in the art would know that in the very heat-sensitive region of the stator can, you're not going to want to use a material that can soften or melt. And I would emphasize that that's the position put forth by our expert, and there was nothing in reply or rebuttal from the expert of the petitioners. If we thought that the board had relied on a mistaken inference about using the same thing, including whatever you might use for the molding, is a remand on that issue warranted or an outright reversal on that? I think it's an outright reversal because the circumstance is that there's no substantial evidence currently supporting the board's conclusion, and the petitioners had every opportunity to present that substantial evidence, either with their petition or on reply. And so I don't think that there's a basis for permitting the petitioners a second crack at the substantial evidence apple, or bite at the apple. What about Zimmerman? Zimmerman. How do we know that those corners are too thick? We know those corners are too thick. Do I have the right? Yeah, yeah. Okay. Umeda has the same issue as well, but Zimmerman has exclusively that issue. We have the Plastics Treatise and Dr. Garris' testimony about the Plastics Treatise, which explain that. Well, I'm not questioning that it's important that material not be too thick. I'm not questioning that, for purposes of this question, that the board misread the Plastics Treatise. Nevertheless, your argument depends on looking at what's in Zimmerman, right, and saying at least those corners, which look like fairly large squares, that those are too thick. And I'm asking, I guess, how do we know that? I understood, Your Honor. We know that, first of all, because there's the testimony of the two experts. On the one hand is no testimony, and on the other hand is the testimony of Dr. Garris, that they are, in fact, too thick. But Zimmerman itself says it's not drawn to scale, right? No, it's not drawn to scale, but it still provides information to a person of skill in the art. And it's not drawn, Zimmerman's not drawn tightly around its pipe and its other components to show an irregular shape of thin material around a component. It's shown drawing a big blocky thing around the whole pipe and everything else. Yeah, but when you've got figures in a patent, when they're not drawn to scale, very often what you have are things that normally would be extremely tiny, and they're blown up, for example, to show you how it would work. So how do we know that that's not what's going on here? Well, I don't think there's any indication in Zimmerman that that is what's going on here, and we do have the burden of proof issue, which we believe indicates that the petitioner had the burden of showing that Zimmerman was suitable for injection molding. Are you arguing that Zimmerman teaches away because of its thickness or apparent thickness? Teaching away is a strong term, but I think we're arguing that it comes pretty close to that. Yes, Your Honor. Okay. Go on. Is there anything in the Zimmerman figure, and forgive me, I don't remember what your expert said about this. The question is, am I remembering right? Your evidence is that the question about thermoplastics is not so much absolute thickness, but comparative thickness across different components of the same material. Am I not remembering that? It's a little bit of both, Your Honor. The absolute thickness certainly matters. Because you could get holes inside. And also the uniformity of thickness matters as well. Well, on the uniformity, does something about the key figure in Zimmerman tell us something about how the corners must be substantially thicker than the little outside portions? And what kind of measurements those must be, given that the curvy pipes must be a certain measurement? Or is it nothing but looking at a drawing and not being able to know even internal relative scales? Well, I mean, we know a little bit about scale just because Zimmerman is described as a pump for removing liquid from a reservoir, and that the pump is going to be submerged in the entire reservoir. So I think we're talking about a sizable object that just on scale alone would be unsuitable for injection molding. But in addition to that, the pipe, I don't know that there's critical functionality described in terms of the shape of the pipe, but it is the shape of the pipe that's disclosed. And with that shape, you're going to have large areas between large gaps in the curves and serpentines of the pipe. If you compare the Zimmerman figures to the Stephan and Neal figures, what is it about that comparison that shows you that Zimmerman is a much thicker product? Well, the first is that Neal is disclosed as being essentially a miniaturized device for driving a disk drive and similar things. And so the parts are inherently much smaller. And looking at, for example, figure three, the thicknesses, particularly when you take into account the internal components that are embedded in the monolithic body, that the thicknesses are relatively uniform as well. And again, we do have the opinion of Dr. Garris on that point in our expert declaration. What about Stephan? Figure seven? Stephan, figure two of Stephan? Yeah, figure two is just the stator itself, so that's not thermoplastic. Figure seven, again, it is a relatively miniaturized component, and the thickness is fairly uniform throughout. You see I'm down to 21 seconds. I'd be happy to reserve that for rebuttal or if the court has more questions. We'll save some rebuttal time. That's it for Mr. Barney. Thank you very much. Good morning, Your Honors. May it please the Court, the Board found each of the claims at issue unpatentable over four separate grounds. And affirming any one of these four grounds is sufficient to affirm the Board's overall judgment of unpatentability. I'd like to start with the Keneshi ground, unless the panel would like to hear something different. The only issue the Court needs to decide for Keneshi is whether substantial evidence supports the Board's finding that it would have been obvious to use thermoplastic material to form Keneshi's stator can. We believe there is, and that evidence includes Keneshi itself, as well as the testimony of Dr. Trumper. So what was Dr. Trumper's testimony with respect to why the thermoplastic could be used on all aspects of Keneshi? Dr. Trumper testified that thermoplastics such as those disclosed in Keneshi were well known to be suitable for high temperature operations, and that's exactly what the stator can would be exposed to in that area of the motor. Why didn't you respond to the patent owner's expert when he discussed the fact that there are certain high temperature operations, and then there are extreme high temperature operations, and they're different things? I don't know why he didn't respond, Your Honor, but what I can say is there is substantial evidence in the record to support the finding that Keneshi... I'd like to just take a step back to answer your question. Keneshi itself discloses pretty much everything you need to know about the use of the thermoplastic motor for the stator can. As you alluded to earlier, Judge O'Malley and Judge Toronto, there are passages in Keneshi that refer to the fact that the stator can, in combination with the stator molded portion, are what is sealing the stator. And then there are other passages that say that sealing the stator core, et cetera, can be done using a thermoplastic motor. So those two disclosures together is a teaching that you can use thermoplastic resonance... What was the last thing that you just were referring to? Well, Keneshi discloses that both the molded portion and the stator can can be made of synthetic resin. That's an undisputed point. Keneshi also discloses that the synthetic resins that can be used to, quote, seal the stator core, et cetera, include thermoplastic resonance. That's the paragraph 30 that you referred to. Did the Board or you rely on that? Yes, Your Honor, the Board relied on those teachings to conclude... Paragraph 30? Paragraph 30 as well as paragraph 38, I believe, but certainly paragraph 30. And concluded that there's a teaching, at least a teaching or suggestion in Keneshi to use thermoplastic resonance for both the stator molded portion as well as the can. Where is that in the Board opinion? So I'm on appendix page 90. And the Board says at the middle of the bottom paragraph, moreover, Keneshi discloses various types of thermoplastics that may be used, quote, to seal the stator core, et cetera, citing paragraphs 30 and 31. Keneshi also discloses that injection molding is an exemplary method of sealing the stator core, paragraph 37. Earlier in the previous sentence, it cites the paragraph 38 for the proposition that Keneshi explicitly states that the stator molded portion and stator core are formed as a single unit. Now, to be clear, this is an obvious misargument. So even if there's not an express disclosure that specifically says you can make the stator can out of a thermoplastic resin, there's still substantial evidence to support the Board's finding because this was an obvious misargument. And what the Board found was you take that teaching of Keneshi in combination with the testimony of Dr. Trumper, who said that thermoplastic resins of the type that are disclosed in Keneshi are suitable for high temperature environments that you would experience in the stator. Those two teachings together are substantial evidence to support the Board's finding. Now, I would also venture to say that Dr. Trumper's testimony on that point is fully supported by other evidence in the record about the state-of-the-art. The Trumper testimony can be found at Appendix 3, 3110 to 11, 3110 to 11. Thank you. Now, if I may just add that Dr. Trumper's testimony is also supported by record evidence regarding the state-of-the-art generally for the use of thermoplastics to encapsulate various motor components. And that was just one example. The Neal reference, which is part of the state-of-the-art and of record in this proceeding, discloses the use of thermoplastics that can be heated to 700 degrees Fahrenheit and can be used to directly encapsulate the windings of a stator, which is where the heat is going to be generated in these motors. And, in fact, Neal discloses the same preferred thermoplastic that the 348 patent discloses as its preferred embodiment, a material called conduit with a K. And the record contains many other examples of the use of thermoplastics to directly encapsulate the windings of a stator. And so this is further evidence supporting not only Dr. Trumper's opinion, but also the finding of the board, that it would have been obvious to use a thermoplastic material for the stator can. Now, unless there's other questions on Kanishi, I'm happy to answer those or I can move on to Zimmerman. Now, with respect to the Zimmerman combination, which was Zimmerman in combination with Stefan and Neal, the only issue the court needs to answer is whether substantial evidence supports the board's finding that it would have been obvious in view of Stefan and Neal to use injection molded thermoplastic to form Zimmerman's monolithic body. And we submit there is, and that evidence includes the Neal and Stefan references themselves, as well as the plastics treatise, all of which the board considered. Why wasn't it your burden to prove that Zimmerman wasn't too thick, as opposed to shifting the burden to the patent holder to show that it was? Your Honor, we disagree that there was any shift of any burden to the patent holder. We know that that's what their argument is. But if you look at what the board did, the board considered the argument they were making, which is essentially an argument against motivation to combine. So in that sense, it's no different than an argument about teaching away, or an argument that the two references are incompatible, or that they would render one of the essential teachings of the patent inoperable. These are all types of arguments that are made against motivation to combine, and what KSR and what Graham instruct and what this court has instructed is that the board is to take all of that type of evidence of non-obviousness and weigh it against the evidence of non-obviousness. And that's what the board did. But that plastics treatise that the board relied on, it only talked about minimum levels of thickness. It didn't define what would occur at a maximum level of thickness, or what a maximum level of thickness was. And it said repeatedly that you don't want it to be too thick. That's correct, Your Honor. It did say that it's the minimum thickness. The conclusion the board drew from that was that the disclosure suggests that the resin appropriate for a part's desired thickness may be chosen to avoid or mitigate the dimpling problem. So the board did not draw the concrete conclusion that my colleagues are suggesting. It simply drew from that discussion that there's a suggestion in that reference that you can choose different types of thermoplastics to achieve different results in your injection molding process, including thicknesses. But the plastics treatise wasn't the only thing the board relied on. The board relied on the Stefan reference as well as the Neal reference. And I know that we went through the Neal reference during my colleague's time. I'd like to refer to Stefan, which is another reference the board relied upon. And if you refer, for instance, to the drawing, the annotated drawing at appendix page 504, you can see that the lower housing portion of Stefan is formed through injection molding. And although it does have... Which figure are you talking about? This is going to be the annotated figure two of Stefan, which you can find at appendix page 504. And the point that the board relied upon is that Stefan is an example of using injection molding where you not only get thin portions, which you can see on the walls of the lower housing, but you also get substantially relatively thicker portions in the form of the wedge-shaped cut-off sections. And you can see a profile of one of those wedge-shaped cut-off sections labeled as number 40. And so the board relied on that evidence. It didn't put the burden on the patent owner. It weighed the evidence. It took the patent owner's evidence of face value, but then weighed that against other evidence that was countervailing. And the Stefan reference, in addition to the Neal reference, were two of the things it relied on, as well as the plastics treatise, which has a teaching that is directly contrary to what their expert said, which is that you wouldn't be able to use injection molding to form components of varying thicknesses. So I think the board did the proper analysis, did the proper weighing of the evidence, and we believe the evidence does support that finding. I've addressed the two references that my colleague addressed during his oral argument. I don't know whether the board has any questions about, excuse me, the panel has any questions about Gould and Yamita, but I would point out that these are two additional independent grounds that the board relied on to find these claims unpatentable. And again, any one of these grounds would be sufficient to affirm the judgment below. Can I just ask a factual question about Gould? Does Gould itself teach, or does some expert say, whether the chopper blade, this is in the right angle to it or not? I don't know that there was any evidence one way or the other about the angle of that, Your Honor. Isn't that what would cause either the water to be sucked down and out or to spit back up in the dishwasher's face? Not being a person of ordinary skill in the art, I would tend to agree with you. Probably stood over a sink and noticed that the water goes down much faster when the garbage disposal is off. So we're assuming that it's working like a fan where the shape of the blade decides which way the air is, in this case, the liquid is going to flow. If I understand your question correctly, I agree with that. I don't think there was any testimony specifically about the angle, but there was testimony from Dr. Trumper that that pump, excuse me, that Gould apparatus would operate like a pump because the impeller would impart a force to the fluid. If you look at the design of that Gould pump, it's very similar to many centrifugal-type pumps where you have some sort of an impeller in the middle spinning around imparting a centrifugal force to the liquid. And if you look at where the outlet of Gould is, it's right there and that's in that outer portion of that centrifugal casing. I had a hard time trying to understand how a 2017 YouTube video has anything to do with 1950s garbage disposals. Your Honor, it was just an example that it was well known in the art, essentially, that garbage disposals, conventional garbage disposals, can be utilized as pumps. It certainly was not intended to, in and of itself, be a secondary reference, for instance. It was just additional evidence to show that this is mainstream knowledge, that you can use a garbage disposal as a pump. The Board relied on it only to that extent. Unless Your Honors have any additional questions. Thank you. And Mr. Stewart. Thank you, Your Honor. Just a couple of points. Regarding the Stephan reference and the annotated figure on appendix page 504, we have found, we think Stephan itself is quite clear that the figure 2 is just a cross-section of the Stephan pump, but with the outer housing not cut away and shown in the lower right-hand corner. And that's just from a reading of Stephan itself. I don't know that there's testimony on that. But that's not a thick, blocky region of thermoplastic. It is the thin outer wall of the funnel-shaped... But that's a factual finding. The Board made a factual finding that it does, in fact, show a thick area. You want us to re-read the references and disagree with the Board's factual conclusions? I think there's no evidence in Stephan to support that factual conclusion. It's simply an acceptance of an attorney argument that was made in the past. I was going to move on to Neal, if there's no further questions on Stephan. The Neal 554 patent, as well as the patent in suit, or the patent under review, the thermoplastic does come into contact with the windings, but the whole point of both of those patents is to cool those very regions, either by bringing a fluid coolant very close to the windings, or to, in the Neal 554, to put cooling inserts right next to those regions. So that's... And this is something that I believe that our expert addressed as well, and that's just not something that indicates that the stator can of Kanishi would be able to withstand the heat in that environment. Lastly, on the Gould patent, following up on Judge Toronto's question, there's just no evidence in the record that the Gould impeller imparts a downward force or an outward force on the liquid flowing through the garbage disposal. So I just don't think there's any evidence in the record that there's a pumping force there or a pump at all. And either downward or outward would, given the direction of the exit conduit, would work to impart a force? Yeah, if the impeller's spinning... That is correct, Your Honor. If the Court has nothing further, I'll rest. Okay, thank you.